FILED BY **MM** D.C.

**Sep 13, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
## 22-20431-CR-MOORE/LOUIS
CASE NO. _____

18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 1001(a)(2)
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

vs.

MIGUEL ANGEL MONTALVO VILLA,
BERNARDO GARMENDIA, and
IVETTE MARIA PORTELA MARTINEZ,

Defendants.

_____/

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At various times relevant to this Indictment:

1.     Clinical investigations, also known as clinical trials, were research studies conducted on voluntary human subjects designed to answer specific questions about the safety or effectiveness of new drugs.  Drug developers, or "sponsors," initiated and took responsibility for clinical trials.

2.     The United States Food and Drug Administration ("FDA") was responsible for determining whether drugs intended for human use were safe and

effective.  The FDA relied on the truthfulness and accuracy of the results of clinical trials to make regulatory decisions about the approval of new drugs.

3.     Before beginning a clinical trial, sponsors were required to provide the FDA with extensive information regarding the proposed trial, including a detailed investigation plan known as a "study protocol."  The study protocol described, among other things, the eligibility and exclusion criteria for study subject selection, schedules of tests and procedures, drug and dosage regimens, a description of observations and measurements to be made to fulfill the clinical trial's objectives, the length of the study, and the health outcomes to be measured by the study.  Clinical trials were required to be conducted according to the study protocol, as well as any applicable laws and FDA regulations.

4.     Sponsors generally retained contract research organizations ("CROs") to oversee and manage various aspects of clinical trials.  Sponsors and CROs typically contracted with multiple clinical trial sites to perform clinical trials.  Under such an arrangement, each individual clinical trial site was responsible for identifying and screening study subjects, ensuring the subjects met eligibility criteria, enrolling them into the clinical trial, performing the clinical trial, gathering data, and reporting the data to the sponsor and/or CRO, in accordance with the study protocol.

5.     Sponsors generally contracted with third-party companies to manage the study data system, process the study data submitted by the clinical trial sites, and to track, send to and receive from the clinical trial sites the study medication. Sponsors also generally contracted with third-party laboratories to receive, test, and analyze

2

samples obtained from subjects that were sent by the clinical trial sites to the laboratories.

6.     An Institutional Review Board was an organization formally designated to monitor and review a clinical trial throughout its course. An Institutional Review Board had the authority to review, require modifications to, or disapprove research.

7.     Each clinical trial site had a clinical investigator, also known as a principal investigator.  The clinical investigator was the individual responsible for conducting the clinical investigation at that clinical trial site and ensuring that the clinical trial was conducted according to the study protocol and in compliance with all applicable FDA regulations.  Responsibilities of the clinical investigator included personally conducting or supervising the clinical trial, including all requirements regarding the qualification of the subjects; obtaining informed consent from subjects; dispensing study medication; collecting and reporting data; reporting adverse events; and ensuring that all employees working on the study met those same obligations.

8.     The clinical investigator also was required, by regulation, to prepare and maintain records relating to clinical trials.  These records, known as "case histories," included adequate records of the disposition of the study drug, including dates and quantities of drugs dispensed to subjects; informed consent forms and medical records for each subject participating in the clinical trial; and records of all observations and other data pertinent to the investigation for each subject administered an experimental drug. The clinical investigator had the authority to delegate certain responsibilities to

clinical trial site staff working on the clinical trial.

9.     The FDA had the authority to inspect a clinical investigator to ensure that the clinical investigator was complying with all applicable laws and regulations in conducting clinical trials.  The FDA's inspection authority included the authority to review case histories and other records maintained by the clinical investigator.

10.     A clinical investigator provided to the sponsor and/or the CRO information about each subject screened for and enrolled in the study, including his or her medical history, laboratory results, and reaction to the drug under study.  The sponsor then provided the information to the FDA for its use in evaluating whether the drug was safe and effective and should be approved for its intended use.

### The Defendants and Their Co-Conspirators

11.     AMB Research Center, Inc. ("AMB Research Center") was a medical clinic located in Miami, Florida that conducted clinical trials of new drugs for pharmaceutical companies and other sponsors.

12.     Defendant **MIGUEL ANGEL MONTALVO VILLA** was a resident of Miami, Florida.  **MONTALVO** was the co-owner of AMB Research Center and served as its Vice-President/Director, President/Director, lead study coordinator, clinical research coordinator, and study coordinator.

13.     Defendant **BERNARDO GARMENDIA** was a resident of Miami, Florida. **GARMENDIA** was the co-owner of AMB Research Center and served as its

Vice-President/Director, clinical research coordinator, and study coordinator.

14.     Defendant **IVETTE MARIA PORTELA MARTINEZ** was a resident of Miami, Florida. **PORTELA** served as recruiting and data entry specialist, site manager, and pharmacist at AMB Research Center.

15.     Co-Conspirator A was the clinical investigator for the CDAD clinical trial.

### The Clinical Trial

16.     **MIGUEL     ANGEL     MONTALVO     VILLA**,     **BERNARDO GARMENDIA**, and **IVETTE MARIA PORTELA MARTINEZ** conducted various clinical trials on behalf of sponsors and CROs located throughout the United States at AMB Research Center.

17.     In or around March 2016, AMB Research Center was contracted to conduct a clinical trial designed to evaluate the safety and efficacy of an investigational drug intended to treat persons with Clostridium difficile-associated diarrhea ("CDAD clinical trial").

18.     Prior to beginning the CDAD clinical trial, **MIGUEL ANGEL MONTALVO VILLA**, on behalf of AMB Research Center, entered into a "Clinical Trial Agreement" with the CRO and sponsor. The Clinical Trial Agreement required, among other things, that AMB Research Center conduct the CDAD clinical trial in strict accordance with the Clinical Trial Agreement and study protocol. The Clinical Trial Agreement also required AMB Research Center and any persons or entities

performing services on its behalf to act in accordance and compliance with all applicable FDA regulations.

19.     The Clinical Trial Agreement required AMB Research Center to obtain informed consent from subjects to participate in the CDAD clinical trial, and to notify the CRO, sponsor, and Institutional Review Board in writing of any deviations from the study protocol and to review all case report forms and case histories for accuracy and completeness.

20.     The study protocol required subjects to meet certain eligibility criteria to be enrolled in the CDAD clinical trial. For example, among other things, the study protocol required subjects to have a diagnosis of mild-moderate or severe CDAD; first occurrence or first recurrence of CDAD within three months of enrollment and diarrhea within 24 hours prior to enrollment; a positive Clostridium difficile test and stool test from the same stool sample collected no more than 72 hours prior to enrollment; and signed written informed consent forms before any study mandated procedure could be conducted.

21.     The study protocol contained exclusion criteria that prohibited investigational site staff members or their relatives from participating in the CDAD clinical trial.

22.     The study protocol required each subject screened to be assigned a unique subject identification number. The clinical investigator/delegate was required to keep a subject identification code list showing the subject's name, date of birth, address, or any other locally accepted identifiers.

23.     The study protocol required subjects participating in the CDAD clinical trial to complete a stool diary, a CDAD DaySyms Pro Questionnaire, a questionnaire entitled "Work Product and Activity Impairment: CDAD," and a study drug journal. The subjects were required to provide the two completed questionnaires, stool diary, and study drug journal to AMB Research Center, from which AMB Research Center was required to enter the data in the appropriate study database.

24.     The Clinical Trial Agreement between AMB Research Center, the CRO and sponsor included a budget and schedule of payments the sponsor would pay AMB Research Center per enrolled subject, provided that AMB Research Center's services were properly performed in accordance with the study protocol and the Clinical Trial Agreement. The schedule of payments in the Clinical Trial Agreement included each informed consent, examination, procedure, test, CDAD questionnaire, office visit, interview, or other event required under the study protocol, in addition to other fees and conditional procedures. The Clinical Trial Agreement also included payments the sponsor would pay AMB Research Center for screen failed subjects found ineligible to participate in the CDAD clinical trial, including applicable visit fees performed in accordance with the study protocol. The Clinical Trial Agreement required that AMB Research Center not be paid for subjects who were enrolled without a properly executed informed consent form and who did not meet eligibility and exclusion criteria.

25.     The Clinical Trial Agreement and study protocol required AMB Research Center, in turn, to pay individual subjects for travel costs not to exceed

$120.00 per enrolled subject in accordance with the study protocol scheduled visit. Reimbursement for subject travel costs exceeding $120.00 required prior written approval from the CRO or sponsor.

26.     The Clinical Trial Agreement provided for subject stipend/compensation to be paid to AMB Research Center on a quarterly basis based on completed visits. Pursuant to the Clinical Trial Agreement, AMB Research Center was required to promptly refund to the CRO any patient stipend/compensation paid by the CRO to AMB Research Center that was not actually paid to the subject.

27.     The Clinical Trial Agreement required AMB Research Center to be responsible for compensating all other entities and individuals involved in conducting the study.

**COUNT 1**
**Conspiracy to Commit Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated as though fully set forth herein.

2.     Beginning in or around September 2015, and continuing at least through in or around March 2018, in Miami-Dade County, in the Southern District of Florida and elsewhere, the defendants,

**MIGUEL ANGEL MONTALVO VILLA,**
**BERNARDO GARMENDIA, and**
**IVETTE MARIA PORTELA MARTINEZ,**

did willfully, that is, with the intent to further the object of the conspiracy, and

knowingly combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit wire fraud, that is: to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) securing contracts to conduct the CDAD clinical trial; (b) fabricating and falsifying documents, study data, and other items related to the CDAD clinical trial to obtain payments and inflate the payments due and owing to the defendants under the Clinical Trial Agreement; (c) receiving payment for the CDAD clinical trial by making material false and fraudulent representations; and (d) using the fraudulently obtained funds for the defendants' personal use and benefit, the use and benefit of others, and to further the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others,

the following:

4.     **MIGUEL     ANGEL     MONTALVO     VILLA,     BERNARDO GARMENDIA,** and **IVETTE MARIA PORTELA MARTINEZ** created false and fraudulent study subjects using the personal identification information of non-study participants and otherwise ineligible individuals, and submitted the information associated with the purported study subjects to the CDAD clinical trial database systems in order to induce the CRO, acting on behalf of the sponsor, to make payments to AMB Research Center to which it was not entitled.

5.     In order to prevent the sponsor, the CRO, and the FDA from learning that **MIGUEL ANGEL MONTALVO VILLA, BERNARDO GARMENDIA,** and **IVETTE MARIA PORTELA MARTINEZ** created false and fraudulent data for the CDAD clinical trial and submitted false and fraudulent data to the CDAD clinical trial database systems, **MONTALVO, GARMENDIA,** and **PORTELA** created false and fraudulent case histories, laboratory tests, and subject study documents of the purported study subjects to make it appear that the subjects had, among other things, satisfied the eligibility criteria to participate in the CDAD clinical trial, signed informed consent forms in the presence of the clinical investigator to participate in the CDAD clinical trial, received a physical examination, provided laboratory samples, received and had taken the study medication, completed the handwritten questionnaires, study drug journals, and stool diaries, and received payment for visits to AMB Research Center as part of the CDAD clinical trial.

6.     **MIGUEL    ANGEL    MONTALVO    VILLA,    BERNARDO GARMENDIA,** and **IVETTE MARIA PORTELA MARTINEZ** and their co-conspirators falsely and fraudulently represented that Co-Conspirator A obtained informed consent from all purported subjects, as required by the study protocol, to be included in the CDAD clinical trial.

7.     As part of their effort to conceal the fact that AMB Research Center falsified study data, **MIGUEL ANGEL MONTALVO VILLA** sent and received emails on behalf of AMB Research Center regarding the CDAD clinical trial.

8.     As a result of the false and fraudulent misrepresentations made by **MIGUEL ANGEL MONTALVO VILLA, BERNARDO GARMENDIA,** and **IVETTE MARIA PORTELA MARTINEZ,** the CRO, acting on behalf of the sponsor, paid AMB Research Center to conduct the CDAD clinical trial.  Thereafter, **MIGUEL   ANGEL   MONTALVO   VILLA,   BERNARDO   GARMENDIA, IVETTE MARIA PORTELA MARTINEZ,** and Co-Conspirator A used the funds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

9.     To induce the sponsor and/or the CRO to enter into a Clinical Trial Agreement with and provide money to the defendants and their co-conspirators, the defendants and their co-conspirators made and caused others to make numerous materially false and fraudulent statements to the sponsor, the CRO and/or the FDA, including, among other things, the following:

**Materially False Statements**

a.    That Co-Conspirator A, AMB Research Center, and individuals involved with AMB Research Center conducted the CDAD clinical trial in accordance with the study protocol and FDA regulations;

b.    That screen failed subjects participated in the screening process and the informed consent process;

c.    That enrolled subjects satisfied the eligibility criteria for the CDAD clinical trial and participated in accordance with the study protocol;

d.    That Co-Conspirator A had obtained informed consent from the subjects;

e.    That each subject had provided stool samples;

f.    That all study subjects had received the study medications and had completed the office visits, interviews, questionnaires, study journals, and stool diaries as required by the study protocol.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Wire Fraud
### (18 U.S.C. §1343)

1.    The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around September 2015, through in or around March 2018, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the

defendants,

**MIGUEL ANGEL MONTALVO VILLA,**
**BERNARDO GARMENDIA, and**
**IVETTE MARIA PORTELA MARTINEZ,**

did knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was the purpose of the scheme and artifice to defraud for the defendants and their accomplices to unlawfully enrich themselves by: (a) securing contracts to conduct the CDAD clinical trial; (b) fabricating and falsifying documents, study data, and other items related to the CDAD clinical trial to obtain payments and inflate the payments due and owing to the defendants under the Clinical Trial Agreement; (c) receiving payment for the CDAD clinical trial by making material false and fraudulent representations; and (d) using the fraudulently obtained funds for the defendants' personal use and benefit, the use and benefit of others, and to further the

scheme and artifice.

## THE SCHEME AND ARTIFICE

4.     The Manner and Means Section of Count 1 of this Indictment is repeated, realleged, and incorporated by reference as though fully set forth herein as the description of the scheme and artifice.

## USE OF WIRES

5.     On or about October 2, 2017, the defendants, for the purpose of executing and in furtherance of aforesaid scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of wire communication certain writings, signs, signals, pictures, and sounds, that is, an email from **MIGUEL ANGEL MONTALVO VILLA,** located in the Southern District of Florida, to a CRO, located in Wilmington, North Carolina, in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 3
### False Statements
### (18 U.S.C. § 1001(a)(2))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about February 20, 2018, in Miami-Dade County, in the Southern District of Florida, in a matter within the jurisdiction of the United States Food and Drug Administration, an agency of the executive branch of the United States

Government, the defendant,

**MIGUEL ANGEL MONTALVO VILLA,**

did knowingly and willfully make false, fictitious, and fraudulent statements and

representations as to a material fact, in that he stated to an investigator with the United

States Food and Drug Administration that Co-Conspirator A obtained informed

consent to participate in the CDAD trial from all subjects with **MONTALVO** present

when in truth and fact, and as the defendant knew, Co-Conspirator A did not obtain

informed consent to participate in the CDAD trial from any of the subjects with

**MONTALVO** present or otherwise, in violation of Title 18, United States Code,

Section 1001(a)(2).

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1.     The allegations of this Indictment are hereby re-alleged and by this

reference fully incorporated herein for the purpose of alleging criminal forfeiture to the

United States of America of certain property in which the defendants, **MIGUEL**

**ANGEL MONTALVO VILLA, BERNARDO GARMENDIA,** and **IVETTE**

**MARIA PORTELA MARTINEZ,** have an interest.

2.     Upon conviction of a violation, or a conspiracy to commit a violation, of

Title 18, United States Code, Section 1343, as alleged in this Indictment, the

defendants shall forfeit to the United States of America, any property, real or personal,

which constitutes, or is derived from proceeds traceable to such offense pursuant to

Title 18, United States Code, Section 981(a)(1)(C).

    3.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to the following:

    a. a sum of approximately $277,920.70, which represents the total amount of funds involved in or derived from the alleged offenses, and may be sought as a forfeiture money judgment.

    4.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third person;

    c.      has been placed beyond the jurisdiction of the Court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be subdivided   without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

███████████████████

FOREPERSON

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GUSTAV W. EYLER
DIRECTOR
CONSUMER PROTECTION BRANCH
U.S. DEPARTMENT OF JUSTICE

KARLA-DEE CLARK
JESSICA C. HARVEY
TRIAL ATTORNEYS
CONSUMER PROTECTION BRANCH
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:** _____

**v.**

Miguel Angel Montalvo Villa, et al.

**CERTIFICATE OF TRIAL ATTORNEY\***

_____/

**Defendants.**

**Superseding Case Information:**

**Court Division** (select one)

☑ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☐ WPB

New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of New Counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) **Yes**
   List language and/or dialect: Spanish

4. This case will take **7** days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   I    ☐ 0 to  5 days
   II   ☑ 6 to 10 days
   III  ☐ 11 to 20 days
   IV   ☐ 21 to 60 days
   V    ☐ 61 days and over

   (Check only one)

   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) **No**
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) **No**

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) **No**

By: _____

KARLA DEE CLARK
DOJ Trial Attorney
Court ID No.   A5502714

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** **MIGUEL ANGEL MONTALVO VILLA**

**Case No:** _____

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Wire Fraud
* **Max. Term of Imprisonment:**   **10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

Count #:   2

Title 18, United States Code, Section 1343

Wire Fraud
* **Max. Term of Imprisonment:   20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   3 – 4

Title 18, United States Code, Section 1001(a)(2)

False Statements
* **Max. Term of Imprisonment:   5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____**BERNARDO GARMENDIA**_____

**Case No:** _____

Count #:   1

___Title 18, United States Code, Section 1349_____

___Conspiracy to Commit Wire Fraud_____
**\* Max. Term of Imprisonment:     10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:   3 years**
**\* Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

Count #:   2

___Title 18, United States Code, Section 1343_____

___Wire Fraud_____
**\* Max. Term of Imprisonment:     20 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:     3 years**
**\* Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**  IVETTE MARIA PORTELA MARTINEZ,

**Case No:**

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Wire Fraud
**\* Max. Term of Imprisonment:     10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:   3 years**
**\* Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

Count #:   2

Title 18, United States Code, Section 1343

Wire Fraud
**\* Max. Term of Imprisonment:     20 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):   N/A**
**\* Max. Supervised Release:    3 years**
**\* Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**